**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

THE ESTATE OF DEENA J. GLAVES
and ANDREA TATOM, as Representative
of the Heirs of Deena J. Glaves,

        Plaintiffs,

v.                                   Case No. 21-1037-DDC-GEB

THE MAPLETON ANDOVER LLC,

        Defendant.

_____

## <u>MEMORANDUM AND ORDER</u>

Plaintiffs the Estate of Deena J. Glaves and Andrea Tatom as Representative of the Heirs of Deena J. Glaves bring this suit against defendant Mapleton Andover LLC, an assisted living facility in Andover, Kansas. Plaintiffs allege that defendant's employee—certified nurse assistant, Muhammad Qadeer Akram—raped Ms. Glaves while she resided at Mapleton. Doc. 73 at 4 (Pretrial Order ¶ 3.a.). They assert that defendant was negligent when it hired Mr. Akram, when it allowed him to work with vulnerable residents, and when it investigated the alleged rape. *Id.* at 5–6 (Pretrial Order ¶ 4.a.).

Before the court is defendant's Motion for Summary Judgment (Doc. 74) and its Memorandum in Support (Doc. 75). Plaintiffs have responded (Doc. 78) and defendant has replied (Doc. 83). For reasons explained below, the court grants defendant's Motion for Summary Judgment in part and denies it in part.

I.      **Uncontroverted Facts**

The following facts are uncontroverted or, where controverted, are stated in the light most favorable to plaintiffs, the parties opposing summary judgment. *See Scott v. Harris*, 550 U.S. 372, 378 (2007).

Defendant is an assisted living facility in Andover, Kansas. Doc. 75-1 at 1 (Stewart Aff. ¶ 2). Plaintiffs contend that on March 25, 2020, Ms. Glaves became a resident at defendant's facility; Ms. Glaves suffered from dementia; and she was completely dependent on her caregivers. Doc. 73 at 2 (Pretrial Order ¶ 3.a.).[1]

Plaintiffs allege that Mr. Akram raped Ms. Glaves, and she died shortly after the assault. They argue that defendant failed to perform an adequate background check and thus acted negligently when it hired Mr. Akram. They also argue that defendant acted negligently when it allowed Mr. Akram access to vulnerable patients, and again later, when it investigated the alleged rape. The court first discusses the summary judgment facts relevant to defendant's hiring process, then addresses those facts relevant to the alleged rape and ensuing investigations.

### *Hiring and Background Check of Mr. Akram*

Defendant hired Muhammad Qadeer Akram as a certified nurse aide on January 1, 2020. Doc. 75-1 at 1 (Stewart Aff. ¶ 3). Before hiring Mr. Akram, defendant conducted a search of him on the Kansas Nurse Aide Registry on December 30, 2019. *Id.* (Stewart Aff. ¶ 4). The result showed no finding that Mr. Akram had committed abuse, neglect, or exploitation. *Id.*; *see id.* at 3 (Nurse Aide Registry Confirmation Notice).

---

[1]      The court uses the language "plaintiffs contend" because neither party submitted admissible evidence in the summary judgment briefing to support these factual contentions, but these alleged facts aren't material to the summary judgment analysis. They provide, however, helpful background and context.

Kimberlie Dobbin[2] began working as the operator of defendant's facility in September 2018 and still occupies that position. *Id.* at 1 (Stewart Aff. ¶ 2). She testified that defendant's employee, Josh Vargo, oversaw defendant's hiring process when it hired Mr. Akram. Doc. 78-8 at 2 (Dobbin Dep. 11:21–12:3). Ms. Dobbin delegated the task of conducting Mr. Akram's criminal history check to Mr. Vargo, and he told her that "he had everything completed," before defendant hired Mr. Akram. *Id.* at 10 (Dobbin Dep. 58:6–60:25). Ms. Dobbin later learned that Mr. Vargo had not conducted a criminal history check on Mr. Akram, so she then requested the information herself. *Id.* Mr. Vargo also told Ms. Dobbin he had checked Mr. Akram's references, and "his references were all good," but later admitted that he hadn't contacted references. *Id.* at 5 (Dobbin Dep. 31:12–32:11).

About six months after hiring Mr. Akram, on June 25, 2020, defendant requested a criminal history record check on Mr. Akram from the Kansas Department for Aging and Disability Services (KDADS). Doc. 75-1 at 1 (Stewart Aff. ¶ 5); *see id.* at 4 (KDADS Criminal Record Check Confirmation). On June 30, 2020, KDADS informed defendant that it had completed Mr. Akram's criminal history record check and found no "existence of any criminal history" based on information from the Kansas Bureau of Investigation (KBI). *Id.* at 1 (Stewart Aff. ¶ 6); *see id* at 5 (June 2020 KDADS Letter).

When KDADS conducts a criminal history record check on an individual, it reviews information from the KBI. Doc. 75-2 at 3 (Hunter 30(b)(6) Dep. 18:25–19:2). KDADS requests "all convictions, both adult and juvenile and any adjudication[;]" then, if the individual does have a criminal record, KDADS refers to its "criminal history record check specialist for them to

---

[2]     Kimberlie Stewart is the name used on her affidavit (signed August 23, 2022) (Doc. 75-1). Ms. Stewart's name previously was Kimberlie Dobbin. *See* Doc. 78-8 (Dobbin deposition taken December 7, 2021). Because she went by Ms. Dobbin during the time the alleged events relevant to this case, the court uses the name Ms. Dobbin.

3

review the convictions and/or adjudications to see if they meet prohibitions listed within [Kan. Stat. Ann. §] 39-970." *Id.* at 3 (Hunter 30(b)(6) Dep. 17:17–18:15).  If the KDADS specialist finds that the applicant has violated a law listed in Kan. Stat. Ann. § 39-970, then KDADS e-mails the facility who requested the criminal history record check to advise it that the "applicant is not eligible for work." *Id.* (Hunter 30(b)(6) Dep. 18:1–14).  Defendant knew that the KDADS criminal record check alerts to violations for a limited number of statutes—those listed in § 39-970.  Doc. 78-8 at 7–8 (Dobbin Dep. 38:15–42:11).

### *KDADS Knowledge of Mr. Akram's Criminal History*

In June 2020, KDADS informed defendant that it had located no "existence of any criminal history" after running a criminal history check on Mr. Akram.  Doc. 75-1 at 1 (Stewart Aff. ¶ 6); *see id.* at 5 (June 2020 KDADS Letter).  At the time, KDADS was unaware that Mr. Akram, in fact, had a criminal history.

KDADS didn't know that Mr. Akram was arrested for an alleged rape in 2005.  Doc. 75-2 at 5 (Hunter 30(b)(6) Dep. 50:22–51:4).  It wasn't until August 6, 2020, when KDADS learned that Mr. Akram had pleaded guilty to one count of conspiracy to commit food stamp fraud, one count of food stamp fraud, and one count of wire fraud in 2011.  *Id.* at 8 (Hunter 30(b)(6) Dep. 61:8–62:18).  Then, in October 2020, KDADS first learned of the following criminal allegations against Mr. Akram:  (1) In 2006, Haysville Police Department investigated Mr. Akram for alleged sexual battery; and (2) In 2008 and 2009, the Kansas Board of Healing Arts took actions against Mr. Akram's physician's assistant license due to alleged sexual misconduct.[3]  *Id.* at 5–7 (Hunter 30(b)(6) Dep. 51:5–53:18, 54:24–60:13).

---

[3]      Defendant's statement of fact includes the language "due to alleged sexual misconduct."  Doc. 75 at 7.  Plaintiffs didn't controvert this fact.  Doc. 78 at 8.  While the court can't locate the quoted language in the cited deposition, the court includes it as part of the summary judgment facts because defendant presented it and plaintiffs don't controvert it.

In 2020, KDADS hadn't implemented the finger-printed background checks required by Kan. Stat. Ann. § 39-970 because it didn't have the necessary "infrastructure" to do so. *Id.* at 8–9 (Hunter 30(b)(6) Dep. 64:24–65:22). Additionally, KDADS testified that it is unable to state whether a criminal record search in January 2020 would have passed or failed Mr. Akram for eligibility. Doc. 78-9 at 9–11 (Hunter 30(b)(6) Dep. 45:2–47:20).

### *Subsequent Background Checks on Mr. Akram*

One of defendant's arguments contends that even if it had conducted additional (or earlier) background checks, it still wouldn't have known about Mr. Akram's criminal history. The following facts—about background checks another adult care facility conducted on Mr. Akram—are relevant to defendant's argument.

On August 16, 2020, Mr. Akram applied for certified nurse aide position at Wheat State Manor, a nursing facility in Whitewater, Kansas. Doc. 75-3 at 1 (Creekmore Aff. ¶¶ 2–3). On August 18, 2020, Wheat State Manor searched Mr. Akram on the Kansas Nurse Aide Registry— and, this search discovered that Mr. Akram hadn't committed abuse, neglect, or exploitation. *Id.* (Creekmore Aff. ¶ 4); *see id.* at 3 (KDADS Nurse Aide Registry Confirmation Notice). On August 21, 2020, Wheat State Manor conducted a background search of Mr. Akram through the U.S. Department of Health & Human Services Officer of Inspector General (OIG). *Id.* at 1 (Creekmore Aff. ¶ 6).[4] The results of OIG's search showed that Mr. Akram wasn't excluded from employment. *Id.*; *see id.* at 4 (OIG Exclusion Search Results).

Wheat State Manor also requested a criminal history record check from KDADS. *Id.* at 1–2 (Creekmore Aff. ¶ 7). On August 25, 2020, Wheat State Manor received a KDADS eligibility determination letter stating that it found Mr. Akram had no criminal history related to

---

[4]    The OIG possesses the authority to exclude individuals from employment at federally funded healthcare programs—like Wheat State Manor—for many reasons. *Id.*

prohibited offenses.  *Id.*; *see id.* at 5 (August 2020 KDADS Letter).  Finally, Wheat State Manor

contacted two of Mr. Akram's three listed references (it was unable to reach the third); both

references gave Mr. Akram positive feedback.  *Id.* at 2 (Creekmore Aff. ¶ 8).  After conducting

these background checks, Wheat State Manor hired Mr. Akram.  *Id.* (Creekmore Aff. ¶ 9).  It

discharged him shortly after hiring him, in November 2020.  *Id.*

### *Alleged Rape of Ms. Glaves and Subsequent Investigations*

On July 30, 2020, one of defendant's hospice nurses discovered that someone had shaved

Ms. Glaves's pubic area.  Doc. 78-11 at 8 (Hooker Dep. 74:5–14).  After learning about this

incident, Andrea Tatom, Ms. Glaves's daughter, called Andover Police to report that someone at

Mapleton had shaved her mother's pubic area and defendant had no explanation for the shaving.

Doc. 78-13 at 6.  An employee at the Attorney General's office advised Ms. Tatom that she

should have her mother tested for sexual assault.  Doc. 78-11 at 7 (Hooker Dep. 45:24–47:3).

On July 31, 2020, defendant suspended Jamie Gordon, another nurse, after the owner of

Mapleton reviewed security footage of the hallway outside of Ms. Glaves's room, and believed

Ms. Gordon was the only person who had entered and remained in the room long enough to

shave Ms. Glaves.  *Id.* at 5–6 (Hooker Dep. 35:22–36:7, 42:10–21).  Defendant and the State

then conducted a more thorough review of the video; they found that on July 30, Ms. Gordon

was in Ms. Glaves's room for a total of 47 minutes, and Mr. Akram was in her room for a total of

one hour and 21 minutes.  Doc. 78-12.

On August 3, 2020, defendant suspended Mr. Akram pending the investigation into the

shaving incident.  Doc. 75-1 at 1 (Stewart Aff. ¶ 7).  On August 10, 2020, defendant terminated

Mr. Akram's employment.  *Id.* at 2 (Stewart Aff. ¶ 8).[5]

---

[5]     Plaintiffs contend that after the KBI investigated the shaving incident, the Butler County
prosecutor charged Mr. Akram with rape of a mentally deficient victim on November 5, 2020.  Doc. 78 at

II.    **Legal Standard**

Summary judgment is appropriate when the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'"  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To meet this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'"  *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'"  *Id.* (quoting *Jenkins v. Wood*, 81

---

2.  And, plaintiffs contend, the Butler County District Court found probable cause to believe that Mr. Akram committed this crime, then Mr. Akram fled to his native Pakistan.  *Id.*  The court cites plaintiffs' brief because neither party asserts these contentions in their statements of material fact nor provides any citations in the summary judgment record to support these alleged facts.  The court includes plaintiffs' contentions simply as background to the legal claims.  But the court recognizes that these facts aren't material to the summary judgment analysis.

F.3d 988, 990 (10th Cir. 1996)); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49.  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."  *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).  "Unsubstantiated allegations carry no probative weight in summary judgment proceedings."  *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Phillips v. Calhoun*, 956 F.2d 949, 951 n.3 (10th Cir. 1992)).  So, to survive summary judgment, the non-moving party's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."  *Id.* (citing *Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir. 1999)).

        Federal courts don't view summary judgment as a "disfavored procedural shortcut."  *Celotex*, 477 U.S. at 327.  To the contrary, it is an important procedure "designed 'to secure the just, speedy[,] and inexpensive determination of every action.'"  *Id.* (quoting Fed. R. Civ. P. 1).

## III.    Analysis

        Plaintiffs allege defendant behaved negligently when it hired Mr. Akram and when it investigated him after the alleged rape of Ms. Glaves.  Plaintiffs characterize their damages as a survivor's action, wrongful death, and one that they simply call "punitive damages."  Doc. 73 at 8 (Pretrial Order ¶ 5).  Plaintiffs assert that they are entitled to recover on six negligence theories: 1) failure to conduct an adequate background investigation; 2) failure to follow established hiring protocol; 3) failure to follow Kan. Stat. Ann. § 39-970, and other Kansas regulations and guidelines when defendant hired Mr. Akram; 4) failure to follow KDADS guidelines to investigate the alleged rape of Ms. Glaves; 5) failure to investigate properly the alleged rape of Ms. Glaves; and 6) failure to investigate Mr. Akram's provision of services to "vulnerable" nursing home residents.  Doc. 73 at 5–6 (Pretrial Order ¶ 4.a.).

The court organizes its analysis of plaintiffs' negligence claims into three groups—claims 1–3 assert defendant was negligent when it hired Mr. Akram; claims 4 and 5 assert defendant was negligent when it investigated Mr. Akram after the alleged rape; and claim 6 asserts defendant was negligent in its supervision of Mr. Akram as an employee with access to vulnerable residents.

Defendant claims that it deserves summary judgment against each claim. It argues that because it complied with mandatory Kansas background checks, it is shielded from civil liability for the negligent hiring claims—claims 1 through 3. Next, defendant claims that the court should grant summary judgment against the negligent investigation claims—claims 4 and 5— because plaintiffs fail to identify a triable issue on the causation requirement, an essential element of negligence claims. Defendant argues that plaintiffs' last claim—claim 6—fails as a matter of law because the court can't hold defendant liable for intentional torts or criminal acts committed by one of its employees. Finally, defendant argues plaintiffs can't state a claim for punitive damages under Kansas law. The court addresses each argument, in turn, below.

## A. Claims 1–3: Does the Kan. Stat. Ann. § 39-970(e) safe harbor shield defendant from civil liability?

Plaintiffs' first three claims assert that defendant acted negligently when it hired Mr. Akram. Defendant argues that Kan. Stat. Ann. § 39-970(e) bars plaintiffs first three claims. This law governs background checks for hiring individuals to work in adult care homes in Kansas. Aspiring to protect the vulnerable population in adult care homes, this Kansas statute prohibits adult care homes from employing people convicted of specified crimes. The statute also shields compliant adult care homes from civil liability in certain circumstances. As relevant here, the statute provides:

> No adult care home, the operator or employees of an adult care home or an
> employment agency or an independent contractor shall be liable for civil damages
> resulting from any decision to employ, to refuse to employ or to discharge from
> employment any person based on such adult care home's compliance with the
> provisions of this section if such adult care home or employment agency acts in
> good faith to comply with this section.

Kan. Stat. Ann. § 39-970(e).  To avail itself of this civil liability shield, defendant must

demonstrate that there is no genuine dispute of material fact that it "act[ed] in good faith to

comply" with the entirety of § 39-970.  *Id.*  It fails to do so.

Defendant interprets Kansas law to require adult care homes to take two steps to screen a

certified nurse assistant before hiring him.  Doc. 75 at 11.  First, under Kan. Admin. Regs. § 26-

41-101(f)(2), the adult care facility must verify that a state nurse aide registry hasn't identified

the applicant as "having abused, neglected, or exploited any resident in an adult care home."

Kan. Admin. Regs. § 26-41-101(f)(2).  Second, under Kan. Stat. Ann. § 39-970(e), the adult care

facility "shall request from [KDADS] an eligibility determination regarding adult and juvenile

convictions and adjudications."  Kan. Stat. Ann. § 39-970(e).  The parties don't dispute that

defendant conducted both a state nurse aide registry check and a KDADS criminal history record

check on Mr. Akram.  Instead, they disagree about what Kansas law requires to act in "good faith

to comply" with § 39-970.

Defendant contends that a pass or fail determination from KDADS's criminal history

record check determines the eligibility of an individual under § 39-970.  To support this

assertion, defendant cites its deposition of Lacey Hunter—KDADS's corporate representative.[6]

*See* Doc. 75-2 at 3 (Hunter 30(b)(6) Dep. 20:3–9) (KDADS uses information to determine

whether an "individual is eligible for employment based off of the criminal history record and

---

[6]     Lacey Hunter is the commissioner of survey, certification, and credentialing at KDADS.  Her
department oversees licensing and credentialing of adult care homes.  Doc. 75-2 at 2 (Hunter 30(b)(6)
Dep. 7:17–24).

the prohibitions listed in [Kan. Stat. Ann. §]39-970"); *see id.* at 4 (Hunter 30(b)(6) Dep. 33:25–34:3) (KDADS made a "pass determination" on Mr. Akram).  Plaintiffs disagree.  Plaintiffs contend, instead, that a KDADS criminal history record check alone doesn't determine whether an applicant is eligible to work in a Kansas adult care home under § 39-970.

More specifically, plaintiffs argue that defendant, as an operator of an adult care home, owed a duty to check other sites to meet the requirements § 39-970 and conduct an "inclusive background check"—beyond the KDADS criminal history records check.  Doc. 78 at 6–7.  To support their argument, plaintiffs also cite the deposition of Ms. Hunter.  *See* Doc. 78-9 at 5 (Hunter 30(b)(6) Dep. 21:10–13) ("ultimately it's up to KDADS to determine whether someone is eligible to work in a Kansas nursing home?" "[Ms. Hunter:] No."); *see id.* at 4 (Hunter 30(b)(6) Dep. 17:12–16) ("And in order to do their due diligence, it is my belief that [an operator of an adult care home] would have to check these other sites in order to ensure that all prohibitions listed in [§]39-970 are checked."); *see id.* at 6 (Hunter 30(b)(6) Dep. 22:10–14) ("I believe in order for [an adult care facility] to do an inclusive background check they would have to include other elements other than just the criminal history record check provided by KDADS.").

Here, the court needn't to reach the merits of the parties' arguments about what the statute requires because the uncontroverted material facts show defendant failed to comply with the plain text of another provision in § 39-970.  Defendant hired Mr. Akram in January of 2020.  It didn't conduct any background check on him until June of 2020, *i.e.*, six months after defendant hired him.  But Section 39-970 dictates who Kansas adult care homes *may employ*.  It doesn't apply to background checks these facilities must run on their current employees.  The

Kansas law permits adult care homes some lag time to comply with the statute in a specific

enumerated circumstance.  Section 39-970(e) states:

> For the purpose of complying with this section, a person who operates an adult
> care home may hire an applicant for provisional employment on a one-time basis
> of 60 calendar days pending the results from the Kansas department for aging and
> disability services of a request for information under this subsection.  A
> provisional employee may only be supervised by an employee that has completed
> all training required by federal regulations, rules and regulations of the
> department and the adult care home's policies and procedures.

Kan. Stat. Ann. § 39-970(e).  Defendant didn't comply with § 39-970(e) when it hired Mr.

Akram.  It never claims that it hired Mr. Akram for "provisional employment."  And even if it

had made this argument, the summary judgment facts show that defendant still didn't comply

with § 39-970(e) within 60-days of hiring Mr. Akram.

Defendant—tacitly anticipating this shortcoming—argues that had it conducted a

background check on Mr. Akram in January 2020 before it hired him, the check would've

produced the same results as the June 2020 check—a clean report.  The parties don't dispute that

KDADS didn't possess knowledge of Mr. Akram's criminal history until after defendant hired

Mr. Akram and after the alleged rape in defendant's facility.  They also don't dispute that Wheat

State Manor, another adult care home, conducted a more extensive background and reference

check on Mr. Akram after defendant terminated his employment.  And that background check

came back clean.  Thus, defendant argues, even if it had complied with §39-970 and conducted a

full background check before hiring Mr. Akram, it still would have hired him.  But this argument

is a causation argument, *i.e.*, the failure to do the required check didn't cause defendant to hire a

prohibited person.  And the absence of causation doesn't mean that defendant complied in good

faith with the Kansas statute.  In sum, plaintiffs have carried their summary judgment burden by

demonstrating a genuine dispute of material fact about defendant's good faith compliance with §
39-970.

Related to that conclusion, the court also concludes that plaintiffs have established a
genuine dispute of material fact whether defendant can avail itself of the civil liability shield in §
39-970(e).  Plaintiffs dispute whether defendant complied with the law because defendant didn't
conduct a background check on Mr. Akram until six months into his employment.  Thus, at this
stage in the proceedings, the court need not weigh in on the arguments over whether a KDADS
criminal history check suffices under the statute or whether defendant must've done a more
comprehensive background check on Mr. Akram to comply with the law or otherwise discharge
its duty of care toward its residents.  And since defendant doesn't present any alternative reasons
for the court to grant summary judgment against claims 1–3, the court denies summary judgment
on those three claims.

### B.  Claims 4–5:  Is defendant entitled to summary judgment due to lack of causation on plaintiffs' failure to investigate negligence claims?

Plaintiffs' claims 4 and 5 allege that defendant negligently investigated the alleged rape
of Ms. Glaves.  Defendant argues that these two claims fail as a matter of law because plaintiffs
can't establish a necessary element for a negligence claim:  causation.  More specifically,
defendant argues that plaintiffs fail to demonstrate causation between the injury alleged by these
claims—the alleged rape of Ms. Glaves—and defendant's subsequent alleged failure to
investigate that alleged rape.  The court agrees with defendant, and thus grants summary
judgment against these two claims.

Kansas law governs this case.  Doc. 73 at 2 (Pretrial Order ¶ 1.d.).  Under Kansas law,
"'to establish a negligence claim, the plaintiff must establish the existence of a duty, a breach of
that duty, an injury, and proximate cause, which means a causal connection between the duty

13

breached and the injury.'" *Sinclair v. Rodriguez*, No. 20-1116-JWB, 2022 WL 558119, at *10 (D. Kan. Feb. 24, 2022) (quoting *Hale v. Brown*, 197 P.3d 438, 440 (Kan. 2008)). "The proximate cause of an injury is that cause which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act." *Neff v. Coleco Indus., Inc.*, 760 F. Supp. 864, 868 (D. Kan. 1991) (citing *State Farm Mut. Auto. Ins. Co. v. Cromwell*, 358 P.2d 761 (Kan. 1961)). "Ordinarily, the proximate cause of an injury is a question for the finder of fact.  However, where all the evidence is undisputed and susceptible of only one inference, proximate cause becomes a question of law for the court." *Id.* (citing *Olson v. U.S. Indus., Inc.*, 649 F. Supp. 1511, 1519 (D. Kan. 1986)).

Defendant argues that the issue of causation here is a question of law that the court properly can and should decide at this summary judgment stage.  The alleged injury—the alleged rape of Ms. Glaves—occurred before defendant investigated it.  Thus, defendant argues, no reasonable jury could find that the allegedly negligent investigation caused plaintiffs' injury. The parties don't dispute the order of events—someone at defendant's facility shaved Ms. Glaves's pubic area; then, defendant investigated the shaving incident (which plaintiffs characterize as evidence of the alleged rape of Ms. Glaves).  This undisputed evidence gives rise to one inference:  defendant's investigation into the alleged rape of Ms. Glaves couldn't have caused an injury—the alleged rape—because that alleged rape had already occurred.  The court agrees with defendant, and it grants summary judgment against these negligence claims as a matter of law.  No reasonable factfinder could find that defendant's negligence, as alleged in these two claims, caused plaintiffs' injury.

Plaintiffs' Response Brief never addresses defendant's causation argument at all. *See* Doc. 78. Instead, plaintiffs argue that defendant failed to "properly investigate the shaving of Ms. Glaves' pubic region" and then engaged in some sort of cover up. *Id.* at 22. Plaintiffs' failure to respond to defendant's summary judgment arguments against these two claims— claims 4 and 5—provides the court an additional and independent reason to grant summary judgment against the claims. *See Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 768 (10th Cir. 2001) (affirming district court's summary judgment against plaintiff's claim because plaintiff had "abandoned [the] claim by failing to address it in his response to defendants' motion for summary judgment"); *Loudon v. K.C. Rehab. Hosp., Inc.*, 339 F. Supp. 3d 1231, 1242 (D. Kan. 2018) (holding that plaintiff had abandoned claim by not responding to defendant's summary judgment arguments against the claim). For both of these reasons, the court grants summary judgment against claims 4 and 5.

### C. Claim 6: Does plaintiffs' negligent supervision claim fail as a matter of law?

Claim 6 alleges that defendant was negligent when it "fail[ed] to properly investigate Akram in his provision of services to vulnerable residents[.]" Doc. 73 at 6 (Pretrial Order ¶ 4.a.6.). Defendant first asserts plaintiffs abandoned this claim when they didn't oppose defendant's summary judgment motion targeting this claim. Next, defendant argues that the court should grant summary judgment against this claim because a court can't hold an employer liable for intentional torts or crimes of its employee. The court addresses both arguments, below.

*First*, defendant is right. Plaintiffs never respond explicitly to defendant's summary judgment arguments on claim 6. The court can grant summary judgment on this ground alone. *See Loudon*, 339 F. Supp. 3d at 1242 (holding that plaintiff had abandoned claim by not responding to defendant's summary judgment arguments against the claim). But, plaintiffs'

Response does indirectly allude to their negligent supervision claim by arguing that the court shouldn't dismiss their claim for punitive damages, *see* Doc. 78 at 26–27 (arguing defendant "also impliedly ratified the actions of [Mr.] Akram" and discussing a case where the defendant "should have known that the employee was a danger to its vulnerable residents"). So, the court, giving plaintiffs the benefit of doubt as the non-moving party, addresses defendant's substantive summary judgment argument and plaintiffs' generalized response.

*Second*, defendant argues that the court should grant summary judgment against this claim because under Kansas law "an employer is not liable for an employee's tortious act, including assault and battery, unless the employer, impliedly or expressly, authorizes the action, or the action falls within the employee's scope of employment." *Carter v. Walmart, Inc.*, No. 18-1335-EFM, 2019 WL 5424759, at *2 (D. Kan. Oct. 23, 2019) (citing *Beggerly v. Walker*, 397 P.2d 395, 399 (Kan. 1964)). Defendant correctly recites Kansas's common law standard for a *respondeat superior* tort claim from *Carter v. Walmart, Inc.*, 2019 WL 5424759, at *2. Doc. 75 at 18. But defendant's motion labels plaintiffs' claim a "negligent supervision claim," and yet it fails to recite the legal standard—recited in the same case—for a *negligent supervision* claim. *Id.*

Kansas law recognizes respondeat superior and negligent supervision as two distinct claims. *See Carter*, 2019 WL 5424759, at *2. To the extent plaintiffs' claim 6 alleges negligent supervision, the court addresses it here. To the extent plaintiffs' claim 6 alleges a respondeat superior claim, the court addresses it in its punitive damages claim analysis, below.[7]

"Negligent supervision applies when an employer fails to supervise its employee while having 'reason to believe that the employment of the employee would result in an undue risk of

---

[7]     The parties also address the respondeat superior theory of recovery in the punitive damages sections of their briefing. *See* Doc. 75 at 22; Doc. 78 at 24–29; Doc. 83 at 18–21.

harm to others.'" *Id.* at *3 (quoting *Wayman v. Accor N. Am. Inc.*, 251 P.3d 640, 650 (Kan. Ct. App. 2011)). "Where an employer knew or should have known of an employee's dangerous propensities, negligent supervision applies if the employer failed to control that employee." *Id.* (citing *Marquis v. State Farm Fire & Cas. Co.*, 961 P.2d 1213, 1223 (Kan. 1998)).

Plaintiffs sufficiently establish that defendant should have known about Mr. Akram's dangerous propensities. Plaintiffs theorize that defendant ignored the statutes governing employment of adult care home professionals, and the guidance provided by KDADS. The summary judgment facts establish that defendant failed to conduct the KDADS criminal history check until six months into Mr. Akram's employment. Plaintiffs contend that defendant's failure to conduct an adequate background check on Mr. Akram caused the alleged rape of Ms. Glaves.

To support their argument, plaintiffs cite testimony by the operator of defendant's facility, Ms. Dobbin. Ms. Dobbin testified that she wouldn't have hired Mr. Akram if she had known about his Kansas Board of Healing Arts censure for misconduct. Doc. 78-8 at 9 (Dobbin Dep. 55:5–8).[8] Plaintiffs present some evidence that Mr. Akram told Ms. Dobbin that he previously had worked as a physician's assistant. Doc. 78-20 (Email from KDADS investigator stating that Ms. Dobbin "was the one who told me when she hired [Mr. Akram] he had been a PA").[9] Plaintiffs argue that Ms. Dobbin should've investigated why Mr. Akram was no longer

---

[8]     Defendant argues this testimony is outside the scope of her designated corporate representative topics. Doc. 83 at 10 (Reply ¶ 44). The court thus considers this testimony to express Ms. Dobbin's personal recollection.

[9]     Defendant objects to this factual proposition—Ms. Dobbin's statement that Mr. Akram informed her of his previous job as a physician's assistant—as hearsay because it's drawn from notes of the KDADS investigator referencing something Ms. Dobbin said to the investigator—and not from testimony of Ms. Dobbin or Mr. Akram. *See* Doc. 83 at 14. Defendant cites Fed. R. Civ. P. 56(c)(2) to support its objection.

        That Rule allows a party to object to "material cited to support or dispute a fact" if that material cited "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Although plaintiffs present Ms. Dobbin's statement in a form not admissible at trial, there are ways for

practicing as a physician's assistant once she learned this information.  And, they argue, if she had conducted even a Google search, she might have learned that the Kansas Board of Healing Arts had taken action against Mr. Akram's physician's assistant license.

Defendant disagrees.  It supplies evidence that it had no reason to believe that employing Mr. Akram would result in an undue risk of harm to others for a couple of reasons.  One reason defendant supplies, KDADS was unaware of Mr. Akram's criminal history until after defendant hired Mr. Akram and after he allegedly raped Ms. Glaves.  A second reason, another adult care facility, Wheat State Manor, conducted a more extensive background check on Mr. Akram— including a KDADS criminal history search, an Office of Inspector General background search, a nurse registry search, and contacted Mr. Akram's references.  Wheat State hired him anyway. Even after the incident at defendant's facility, Wheat State Manor found nothing in Mr. Akram's record that prevented hiring him.

Both parties' arguments raise pertinent questions—must an adult care home conduct a more thorough background check before hiring a certified nurse assistant?  Would a more thorough vetting of this particular employee have resulted in a different outcome for Ms. Glaves? These are difficult questions, but they are questions of fact for the factfinder to decide, not questions of law.  Based on this summary judgment record, a reasonable jury could find defendant should have known about Mr. Akram's alleged dangerous propensity.  A reasonable jury also could conclude that defendant could not have known about it without violating the

---

plaintiffs to make the statement admissible.  That's all the Rule requires at the summary judgment stage. *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005) ("At the summary judgment stage, the parties need not submit evidence in a form admissible at trial; however, the content or the substance of the evidence must be admissible."); *Cook v. Babbitt*, 819 F. Supp. 1, 25 (D.D.C. 1993) ("in judging whether a *non-movant* has produced enough *to avoid* summary judgment, the [c]ourt must consider the evidence they submitted—even if it would be inadmissible at trial in the form submitted—so long as it could be reduced to an admissible form for trial.").  Thus, the court considers this evidence, when deciding whether plaintiffs have created a genuine dispute of material fact.

standard of care.  In sum, this fact question could go either way.  And it's not a question the court can decide on summary judgment.  Thus, to the extent that claim 6 alleges negligent supervision, the court denies summary judgment against that claim.

### D.  Can plaintiffs pursue punitive damages?

Defendant asks the court to grant summary judgment against plaintiffs' claims for punitive damages.  Two reasons warrant this result, defendant asserts.  First, defendant argues that plaintiffs forfeited any punitive damages claims by not including any allegations of "willful conduct, wanton conduct, fraud, or malice" in its factual contentions in the Pretrial Order.  Second, defendant argues, plaintiffs fail to state a claim for punitive damages as a matter of law.  The court addresses each argument, below.

*First*, defendant contends that plaintiffs abandoned their claims for punitive damages by not properly preserving such claims in the Pretrial Order.  The Pretrial Order controls the course of litigation, of course.  Fed. R. Civ. P. 16(c).  "As such, claims, issues, defenses, or theories of damages not included in the pretrial order are waived[.]"  *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002).  Plaintiffs respond to defendant's argument, contending that there's no requirement to plead the elements of damages sought.  Doc. 78 at 8 (Response ¶ 27).  The court agrees with plaintiffs.  Plaintiffs have shown that the Pretrial Order includes their pursuit of punitive damages based on their negligence claims.  Doc. 73 at 8 (Pretrial Order ¶ 5).  So, they didn't abandon this theory of damages.  Also, they included factual contentions that qualify as willful or wanton conduct on defendant's part in the Pretrial Order.  *Id.* at 2–4 (Pretrial Order ¶ 3.a.).  Although plaintiffs could've drafted their claims more clearly, the court concludes that plaintiffs adequately preserved their punitive theories.  Thus, plaintiffs aren't precluded by the scope of the Pretrial Order from pursuing punitive damages.

*Second*, defendant argues that plaintiffs haven't stated a viable claim for punitive damages. It argues that plaintiffs' allegations—that defendant failed to conduct an adequate background check of Mr. Akram—fail to state a viable claim for punitive damages under Kansas law.

The parties agree that Kan. Stat. Ann. § 60-3701 governs the punitive damages analysis. Doc. 73 at 2 (Pretrial Order ¶ 1.d.). Kan. Stat. Ann § 60-3701(c) requires that "[i]n any civil action where claims for exemplary or punitive damages are included, the plaintiff shall have the burden of proving, by clear and convincing evidence in the initial phase of the trial, that the defendant acted toward the plaintiff with willful conduct, wanton conduct, fraud or malice." Kan. Stat. Ann. § 60-3701(c). Also, relevant here, Kan. Stat. Ann. § 60-3701(d)(1) provides:

> In no case shall exemplary or punitive damages be assessed pursuant to this section against:  A principal or employer for the acts of an agent or employee unless the questioned conduct was authorized or ratified by a person expressly empowered to do so on behalf of the principal or employer[.]

Kan. Stat. Ann. § 60-3701(d)(1). To pursue punitive damages under this statute's limitation, plaintiffs must demonstrate a genuine dispute that defendant authorized or ratified the questioned conduct. *See id.* "'A claim for punitive damages is not a "cause of action" triable to a jury; a punitive damage award is incident to and dependent upon the recovery of actual damages.'" *A.H. ex rel. Hohe v. Knowledge Learning Corp.*, No. 09-2517-DJW, 2011 WL 2731757, at *3 (D. Kan. July 13, 2011) (quoting *Smith v. Printup*, 866 P.2d 985, 992 (Kan. 1993)).

After the court's summary judgment analysis, only negligent hiring and negligent supervision claims remain. Under Kansas law, plaintiffs can't recover punitive damages for these claims. *Id.* ("claims of negligent hiring, training, retention, and supervision . . . do not, as a matter of law, provide an independent basis for recovering punitive damages against the employer." (citation and internal quotation marks omitted)). Also, a claim for punitive damages

20

isn't a standalone cause of action. *Id.* at *2 (citing *Morsey v. Chevron, USA, Inc.*, 94 F.3d 1470, 1477 (10th Cir. 1996)).[10] So, to avoid summary judgment on punitive damages, plaintiffs must demonstrate a genuine dispute of material fact that defendant authorized or ratified Mr. Akram's alleged conduct, or that defendant's conduct otherwise was willful, malicious, or wanton.

### Did defendant authorize Mr. Akram's alleged conduct?

Defendant argues that the court should grant summary judgment against plaintiffs' claim because under Kansas law "an employer is not liable for an employee's tortious act, including assault and battery, unless the employer, impliedly or expressly, authorizes the action, or the action falls within the employee's scope of employment." *Carter*, 2019 WL 5424759, at *2 (citing *Beggerly v. Walker*, 397 P.2d 395, 399 (Kan. 1964)). Defendant correctly states the standard for the common law tort, *respondeat superior*, "which allows employers to be vicariously liable for an employee's actions under certain circumstances." *Id.* Under this doctrine, an employer is not vicariously liable when "a claimant alleges an employee committed an intentional tort for personal reasons or to accomplish an unlawful purpose not in furtherance of the employer's business." *Id.* (citing *Williams v. Cmty. Drive-In Theater*, 520 P.2d 1296, 1301–02 (Kan. 1974)).

Defendant asserts that the following facts are undisputed: rape isn't within the scope of employment for a certified nurse assistant at Mapleton, defendant didn't authorize its employee to rape one of its residents, and if that rape in fact occurred, defendant didn't ratify or condone it. *See* Doc. 75-1 at 2 (Stewart Aff. ¶¶ 9–10). Plaintiffs don't dispute that rape wasn't within the

---

[10]     Plaintiffs mistakenly cite *A.H. ex rel. Hohe v. Knowledge Learning Corporation*, to stand for the proposition that a plaintiff could pursue punitive damages against a daycare—for an employee's physical abuse of a child—on the negligence theory that it "should have known that the employee was a danger to its vulnerable" students. Doc. 78 at 26–27. But, the court held the opposite, in this case. It held that the plaintiff's claims of negligent hiring, training, retention, and supervision, didn't provide "an underlying claim to properly attach his claim for punitive damages[.]" *A.H. ex rel. Hohe*, 2011 WL 2731757, at *3.

scope of Mr. Akram's employment.  Doc. 78 at 7.  But they dispute that defendant didn't authorize and ratify the alleged rape.  *Id.*

An employer can authorize an employee's conduct either expressly or impliedly.  *See Rothwell v. Werner Enterprises, Inc.*, 859 F. Supp. 470, 476–77 (D. Kan. 1994) (citing *Smith*, 866 P.2d at 1003), *superseded by statute on other grounds as stated in Patterson v. Dahlsten Truck Line, Inc.*, 130 F. Supp. 2d 1228, 1232 (D. Kan. 2000).  Plaintiffs argue that defendant impliedly ratified the alleged actions of Mr. Akram.  Employers impliedly authorize an employee's conduct by engaging in "a course of conduct indicating that the employee has been given the right to engage in the conduct at issue."  *Id.*  "Ratification, too, may be either express or implied, and may be accomplished before, during or after the employee's questioned conduct."  *Id.*  The court concludes that plaintiffs failed to create a genuine dispute whether defendant engaged in a course of conduct that would indicate that one of its employees had the right to rape one of its residents.  The court now explains why this is so.

 Plaintiffs assert that defendant ratified or authorized two separate acts that are causally connected to the damages sustained.  The first act is Josh Vargo's failure to conduct a KDADS criminal history check before defendant hired Mr. Akram.  Plaintiffs argue that Mr. Vargo's failure to request a KDADS criminal history check and follow protocol constituted a wanton act of disregard for defendant's residents.  The second act is Ms. Dobbin's failure to conduct the KDADS criminal history check until six months into Mr. Akram's tenure at defendant's facility.  These two acts essentially comprise one act—defendant's employees in charge of hiring didn't run the KDADS criminal history check before hiring Mr. Akram, and when someone realized the oversight—six months later—she requested the criminal history check.

Plaintiffs also argue that defendant impliedly ratified the actions of Mr. Akram. They argue that if an employee engaged in prior conduct that might have put the employer on notice that the conduct in question was "imminent or highly likely to occur"—that prior conduct supports a conclusion of authorization or ratification. Doc. 78 at 28 (citing *Brent v. Walmart, Inc.*, No. 20-CV-01158-TC, 2022 WL 428474, at *6 (D. Kan. Feb. 11, 2022)). But plaintiffs didn't allege that Mr. Akram engaged in any conduct while working at defendant's facility that might have put defendant on notice. They only argue that defendant should've known about Mr. Akram's earlier alleged conduct because defendant's employees should have investigated his background more thoroughly. Defendant's failure to conduct a criminal history check for the first six months of Mr. Akram's employment doesn't suffice to dispute that defendant impliedly authorized its employee to rape one of its residents.

Plaintiffs fail to demonstrate that defendant "sanctioned a 'course of causally related misconduct' over a time period leading up to" Mr. Akram allegedly raping Ms. Glaves. *Brent*, 2022 WL 428474, at *6 (quoting *Smith*, 866 P.2d at 1004–1005). "'Ongoing tolerance' of a continuous course of tortious conduct that causes the injury may amount to ratification or authorization." *Id.* (quoting *Smith*, 866 P.2d at 1007). "But the fact that an employee caused a foreseeable injury, alone, is not enough to support a punitive damages claim against an employer." *Id.* (citing *Stallings v. Werner Enters., Inc.*, 598 F. Supp. 2d 1203, 1215 (D. Kan. 2009)). "Nor is it sufficient that an employer was negligent or reckless in hiring, supervising, training, or retaining an employee or agent." *Id.* (citing *Smith*, 866 P.2d at 1000, 1013). At most, plaintiffs present a dispute that defendant was negligent in hiring and supervising its employee. But plaintiffs' argument that defendant authorized any wanton conduct falls far short of the controlling legal standard.

Plaintiffs also argue that defendant's alleged failure to investigate the shaving incident amounted to ratification under Kan. Stat. Ann. § 60-3701(d)(1). This argument also fails. Plaintiffs contend the following evidence amounts to ratification and some sort of cover up on behalf of Mr. Akram:  initial suspension of another nurse; the delay in suspending Mr. Akram; and a conversation where Ms. Dobbin allegedly told Ms. Tatom that the other nurse was responsible for shaving her mother.  Plaintiffs' evidence on this front is weak, barely enough to provide a basis for a reasonable jury finding or inference.  But even when accepted as legally sufficient, plaintiffs' ratification argument still fails.  The undisputed facts show that defendant started investigating the shaving incident immediately after a nurse discovered it, and defendant suspended Mr. Akram's employment a few days later.

Plaintiffs also run into the same causation problem that doomed their investigation theory, discussed above in the Claims 4–5 section.  *See Brent*, 2022 WL 428474, at *6 (holding that plaintiff's theory of defendant's alleged "cover up" didn't itself give rise to the conduct that resulted in plaintiff's injury, and thus failed to raise a genuine dispute. (citing *Smith*, 866 P.2d at 1004 ("We conclude that there must be a determination that the corporate defendants authorized or ratified the conduct . . . that proximately caused the accident."))).  For all of these reasons, plaintiffs' argument here raises no genuine dispute about ratification.

In sum, plaintiffs fail to present a viable claim that defendant ratified Mr. Akram's alleged rape of Ms. Glaves.  Based on the summary judgment facts, no reasonable jury could find that defendant authorized its employee to rape one of its residents, or that it later ratified the alleged wanton conduct.  Thus, to the extent that plaintiffs rely on an authorization claim, the court grants summary judgment against that claim.

### *Did defendant engage in willful or wanton conduct toward Ms. Glaves?*

Plaintiffs also appear to go a step further and argue that defendant's failure to conduct a background check beyond the KDADS criminal history check itself amounted to willful and wanton conduct toward Ms. Glaves.  Under that theory, "[t]o recover punitive damages, plaintiff must show by clear and convincing evidence that defendant's conduct was willful, malicious or wanton." *D.M. by & through Morgan v. Wesley Med. Ctr., LLC*, 487 F. Supp. 3d 1071, 1078 (D. Kan. 2020).

"Wantonness refers to the 'mental attitude of the wrongdoer rather than a particular act of negligence.'" *Id.* (quoting *P.S. ex rel. Nelson v. The Farm, Inc.*, 658 F. Supp. 2d 1281, 1303 (D. Kan. 2009)).  The Kansas Supreme Court defines wanton conduct this way:

> Wanton conduct is an act performed with a realization of the imminence of danger and a reckless disregard or complete indifference to the probable consequences of the act.  A wanton act is more than ordinary negligence but less than a willful act. For an act to be wanton, the actor must realize the imminence of danger and recklessly disregard and be indifferent to the consequences of his or her act. Wantonness refers to the mental attitude of the wrongdoer rather than a particular act of negligence.

*Reeves v. Carlson*, 969 P.2d 252, 256 (Kan. 1998) (internal citations omitted).

For defendant's employees' acts to qualify as wanton, they must have 1) realized imminent danger and 2) recklessly disregarded that danger.  *D.M. by & through Morgan*, 487 F. Supp. 3d at 1078.  On the first prong, the court asks "whether based on defendant['s] knowledge of existing conditions, [it was] aware that [its] action or inaction 'would likely or probably result' in the injury or other known risk or complication."  *Id.* (quoting *Holt v. Wesley Med. Ctr., LLC*, No. 00-1318-JAR, 2004 WL 1636574, at *8 (D. Kan. 2004)).  The second prong—reckless disregard and indifference—doesn't require a direct intention to injure a particular person. Instead it requires a degree of indifference toward others that is reckless, not just negligent,

under circumstances that involve danger to life or safety of others.  *See id.*; *see also P.S. ex rel. Nelson*, 658 F. Supp. 2d at 1303; *Reeves*, 969 P.2d at 256–57.

 Plaintiffs cite Ms. Dobbin's deposition to support their argument that her failure to conduct a more thorough background check amounted to wanton conduct.  Plaintiffs asked Ms. Dobbin if she "had done the background check and found what the Board of Healing Arts had done to this guy, would you have hired him?"  She answered "no."  Doc. 78-8 at 9 (Dobbin Dep. 55:5–8).  Plaintiffs argue that this alleged failure to conduct a more thorough background check amounted to "wanton and willful conduct which led to the rape of a resident[.]"  Doc. 78 at 26.

 Plaintiffs' argument fails on prong one.  Ms. Dobbin testified that the assistant operator, Mr. Vargo, informed her that he had conducted the criminal history check when he hired Mr. Akram.  Then, six months later, when Ms. Dobbin learned that Mr. Vargo hadn't done so, she requested the criminal record.  Ms. Dobbin then received a confirmation from KDADS that Mr. Akram had no record of criminal history.  Ms. Dobbin then operated—all before the alleged incident occurred—on the honest belief, informed by a KDADS finding, that Mr. Akram had no criminal history.  One statement that she would have acted differently had she known of a license issue (that the record indisputably shows she didn't know about), doesn't establish a genuine dispute of wanton conduct.

 The court concludes that plaintiffs' evidence isn't sufficient to create a question of material fact whether defendant acted wantonly.[11]  Plaintiffs' evidence may support a finding of negligence, but nothing more.  At most, a jury could infer from this evidence that defendant should have appreciated a risk of abuse—but, there is no evidence that defendant "realized and

---

[11]      Wantonness is usually a fact question.  But when reasonable persons "could not reach differing conclusions from the same evidence" the court may decide the issue of wantonness "as a question of law."  *Danaher v. Wild Oats Mkts., Inc.*, 779 F. Supp. 2d 1198, 1213 (D. Kan. 2011).

then disregarded an imminent danger of sexual abuse" in its facility. *P.S. ex rel. Nelson*, 658 F. Supp. 2d at 1304. And "in the absence of any evidence that anyone actually realized that abuse was likely taking place, plaintiffs cannot show that there was an obvious risk so great as to make it highly likely that abuse would result." *Id.* Thus, the court grants summary judgment against plaintiffs' claim that defendant acted wantonly.

## IV.   Conclusion

In sum, the court denies summary judgment on claims 1–3 and claim 6 to the extent that claim 6 alleges negligent supervision. The court grants summary judgment against claims 4 and 5 and grants summary judgment against claim 6 to the extent it relies on a respondeat superior theory of recovery. Only plaintiffs' negligent hiring and negligent supervision claims remain for trial. Thus, the court concludes that no remaining underlying claim exists to support a claim for punitive damages.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion for Summary Judgment (Doc. 74) is granted in part and denied in part as explained in full by this Order.

**IT IS SO ORDERED.**

**Dated this 2nd day of March, 2023 at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
